[823 NYS2d 381]

In the Matter of the Estate of PHILIP ISENBERG, Deceased. RICHARD ISENBERG, Appellant; DORIS BERGER, as Executrix of PHILIP ISENBERG, Deceased, Respondent.

First Department, October 31, 2006

**APPEARANCES OF COUNSEL**

*McLaughlin & Stern, LLP*, New York City (*Paul E. Van Horn* of counsel), for appellant.

*Law Offices of Joseph D'Elia*, Huntington (*Mark G. Vaughan* of counsel), for respondent.

**OPINION OF THE COURT**

BUCKLEY, P.J.

Testator, who during his lifetime had acquired and displayed throughout his dwelling numerous paintings, statues, and other art objects by struggling local artists, provided in his will:

> "I give and bequeath to my sister, GLADYS ISEN-BERG BERGER, any and all household items which she desires to take from my principal residence after my decease. Anything which she does not take from my principal residence shall become part of my residuary estate."

Testator's intent, as expressed in the will, was that his sister could select those "household items" that would be considered "household items" in her own home, i.e., items that she desired to keep. The remainder of testator's property, if any remainder existed, would then pass to the four residuary beneficiaries. The will did not mention any other type of items, and the only other special bequests were of sums of money.

The Surrogate correctly ruled that this bequest of "household items" included all the artwork in testator's home, whether on display or stored in a closet (*see In re Smedley's Estate*, 69 NYS2d 542 [1947]).

Contrary to petitioner's contention, the elderly sister, who was living in Massachusetts at the time of her brother's demise, was not required to travel to the latter's New York apartment and physically remove each piece of art she desired. The record demonstrates that testator's sister affirmatively selected those pieces of art that she wanted, although this selection was actually carried out by her son, who was one of the four residuary beneficiaries. To the extent she gave away or sold some of those pieces of art, the Surrogate properly ordered their return, as well as the proceeds from any sale, to the estate for distribution to the residuary beneficiaries in accordance with paragraph EIGHTH of the will (*see Matter of Gano*, 203 Misc 718 [1952]).

With respect to the partial dissent's position that the sister never made any selection, her very actions of keeping some objects but giving away or selling others demonstrate that she chose certain pieces of art. While that might not have been particularly considerate of the residuary beneficiaries, the will

placed no limitation on the number or percentage of items she could select, nor did it stipulate that she evince a particular level of sentimental or aesthetic appreciation towards them.

Accordingly, the order of the Surrogate's Court, New York County (Renee R. Roth, S.), entered on or about December 6, 2002, which, to the extent appealed from, determined that the term "household items" as used in paragraph FOURTH of the will encompassed the paintings, figurines, and other artwork in testator's home, including those items on display and those stored in the closet, and allowed such items selected by the designated beneficiary to be collected and shipped to her without her retrieving them in person, should be affirmed, without costs.

McGUIRE, J. (concurring in part and dissenting in part). Although I agree with the majority's analysis in part, I respectfully disagree with its conclusion about the selection ostensibly made by the testator's sister.

The residuary legatees of the testator, Philip Isenberg, are his four nephews, Howard and Harold Berger, the sons of his elderly, surviving sister, Gladys, and Robert and petitioner-appellant Richard Isenberg, the sons of a sibling of the testator who predeceased him. At all relevant times, Howard and his wife, respondent Doris Berger, the executrix designated in the will, lived in Connecticut; Gladys lived in Massachusetts until January 1998, when she moved into her own apartment in Howard's house. By all accounts, the testator amassed a large number of paintings; they covered the walls in the apartment he owned in Manhattan and some were stored in a closet or closets. Howard testified there were between 40 and 60 paintings. Howard's nephew, Jeffrey Berger, however, affirmed that the testator had about 80 paintings in his apartment. An individual who described himself as a long-term friend of the testator affirmed that there were more than 100 paintings.

Apparently, the testator belonged to one or more art clubs, regularly supported struggling artists and commonly purchased paintings through the club or clubs. In addition, the testator's art collection included some bronze and other sculptures and porcelain figurines. At no time after the testator's death did Doris or her husband Howard, who handled some of his wife's responsibilities as executrix, prepare an inventory of or photograph the items in the apartment or any of them. Thus, the precise number and nature of the items is not clear. Although Howard had the collection appraised, the reliability of the valuation is very much in dispute. Before the Surrogate, Doris's

counsel referred to it, consistent with the testimony about it, as an "informal" appraisal. In any event, the appraiser, who kept no records but thought he evaluated about 50 paintings, estimated the value of the paintings at $15,000. The appraiser or an associate estimated the value of the sculptures and the porcelain figurines at $12,900.

In December 1996, following the testator's death on November 17, 1996, Howard, his brother Harold and Harold's wife packed the paintings, bronze sculptures and figurines into boxes; Howard and Jeffrey transported them to Howard's home in Connecticut. As of Howard's deposition in March 2000, many of the paintings were hanging in his home, but others remained where he put them when he unpacked them, against the wall on the floor of his bedroom. Howard testified that he brought "some" of the items to his mother's apartment in Massachusetts, and that his mother gave away paintings or other of the objects of art. The recipients included his daughter and her husband, his mother-in-law, his wife's uncle, a neighbor and some friends. Harold was in possession of the bronze sculptures, although Howard had "a couple" of them. In early 1998, Howard sold three of the paintings by a particular artist to a relative of the painter who had contacted him by telephone with the apparent assistance of the art club that facilitated their sale to the testator. According to Howard, his mother had given the paintings to him; the buyer, whom he met up with at a train station, paid "about" $1,000 in cash for the paintings.

The phrases "household effects" and "household goods" have been interpreted broadly by numerous courts (*see e.g. In re Mitchell's Will*, 38 NYS2d 673 [1942]; *Matter of Winburn*, 139 Misc 5 [1931]). Accordingly, I agree with the majority and the Surrogate that the phrase "household items" encompassed all the artwork in the testator's apartment. I also agree that Gladys was not required to travel to the testator's apartment in New York City in order to exercise her right under the will to take any household items "which she desire[d] to take," but note that appellant does not contend that she was so required. Although the majority nonetheless imputes this contention to appellant, the point need not be debated. The decisive point is that the majority is wrong in asserting that "[t]he record demonstrates that testator's sister affirmatively selected those pieces of art that she wanted, although this selection was actually carried out by her son, who was one of the four residuary beneficiaries."

To the contrary, there is not a shred of evidence in the record that Gladys made anything like the kind of selection contemplated by the will. Gladys certainly did not testify that she had made any selection. Doris, the executrix, did not submit an affidavit from Gladys asserting that she had chosen which objects to take. Neither Howard nor Doris, moreover, ever testified to any such selection. Nor, for that matter, did Howard ever claim that in taking "some" of the property to Gladys's home he had "carried out" or otherwise effected a selection that had been made by Gladys. As no photographs were ever taken of the art in the testator's apartment, Gladys could have selected among them only if they were described to her. There is no evidence anyone gave her such a description and, as noted, no inventory was ever made.

The only evidence of any relevance is that Howard brought "some" of the items—he was not even able to say which ones—to Gladys's apartment in Massachusetts at some point before she moved into his Connecticut home in January 1998. Nothing in the record reveals anything about why Howard brought to her some but not other of the items, let alone suggests that she somehow selected the items he brought to her. All the record establishes is that Gladys had some of the items and gave others of them away; it sheds no light on why she had some and not others.

In addition, Howard certainly did not tell his mother that under the will she was to select the items she desired to take and that the remaining items belonged to all four of her brother's nephews. After all, Howard testified that all the contents of the testator's apartment belonged to his mother. According to Howard, he read in the will that the contents belonged to his mother, a prior attorney "validated" this reading of the will and he knew his uncle intended his mother to be the recipient of all of the contents of the apartment. Even assuming Howard in good faith believed the contents of the apartment to belong to his mother, his avowed reading of the will is indefensible. More to the point, on Howard's reading of the will he had no reason to alert his mother to the need for her to select the items she desired to take.

The majority reasons that Gladys's "very actions of keeping some objects but giving away or selling others demonstrate that she chose certain pieces of art." That is true but irrelevant. To affirm, there must be a basis in the record for concluding that Gladys chose to keep *all* the items other than those she sold or

gave away. Because Gladys chose (that is, did not sell or give away) certain of the items, it hardly follows that she ever saw or became familiar with all of the scores of other items in the testator's apartment. Presumably, the majority would agree that if the record established, for example, that Gladys saw or became familiar with only 10 of the items and chose to keep five, there would not be any basis for concluding she had made the kind of selection contemplated by the will. The actual record establishes only that Gladys saw "some" of the objects—the ones Howard chose to bring to her apartment—and similarly affords no reasonable basis for concluding that Gladys made a choice to keep for herself all the items other than the ones she gave away or sold.

In short, I agree with the majority and the Surrogate that the items of art given away by Gladys and the proceeds of the paintings sold by Howard belong to the residuary legatees. None of the items and none of the other "household items," however, were disposed of in accordance with the will, and the executrix should be required to account for these items (*see Matter of Camarda,* 63 AD2d 837 [1978]). Nonetheless, petitioner's contention that all the household items should be distributed to the residuary legatees should be rejected. If, as appears to be the case, Gladys was never informed that she had the right to take whatever items she desired, acceptance of petitioner's contention would deprive her of that right. Whether there is a basis for depriving her of that right, and the related issue of whether at this juncture that right could be exercised by Gladys in a manner that would be fair to all the residuary legatees, are matters for the Surrogate in the first instance.*

MARLOW, SWEENY and CATTERSON, JJ., concur with BUCKLEY, P.J.; MCGUIRE, J., concurs in part and dissents in part in a separate opinion.

Order, Surrogate's Court, New York County, entered on or about December 6, 2002, affirmed, without costs.

---

* Gladys was not a party to the proceedings before the Surrogate and I do not mean to exclude the possibility, however remote, that she in fact was aware of the terms of the will and actually selected the items she desired. That, too, is a matter that should be addressed in subsequent proceedings.